McDONALD, C. J., and CLARK, BIRD, SHARPE, STEERE, FELLOWS, and WIEST, JJ., concurred.

BIRD *v.* BIRD.

1. TRUSTS—FRAUD—LACHES—ESTOPPEL.

In a suit by a brother to recover his one-fourth interest in a farm willed to him by his mother, which he deeded to his sisters at their request and on their representation that they would hold it in trust for the mutual benefit of all, where it appears that he acted with reasonable promptness after learning of his sisters' fraud in repudiating the trust and claiming to own the legal title, he cannot be said to be guilty of laches.[1]

2. SAME—TRUST MAY NOT BE REPUDIATED ON GROUND THAT ITS OBJECT WAS TO DEFEAT CREDITORS WHERE NO CREDITOR COMPLAINING.

Where said trust was declared both orally and in writing it may not be repudiated by the sisters on the ground that it was created for the purpose of defeating plaintiff's

[1]Trusts, 39 Cyc. p. 603.

creditors, especially where the deed was not used for said purpose, and no creditor is complaining.[2]

Appeal from Washtenaw; Sample (George W.), J. Submitted January 16, 1925. (Docket No. 75.) Decided October 1, 1925.

Bill by John M. Bird against Jennie L. Bird and others to recover an interest in real estate held in trust. From a decree for plaintiff, defendants appeal. Affirmed.

*Stivers & Laird,* for plaintiff.

*George J. Burke,* for defendants.

STEERE, J.     Plaintiff, John M. Bird, is a son of Jane C. Bird, formerly of Ann Arbor township, Washtenaw county, who died November 29, 1907, leaving an estate consisting of an 80-acre farm near the city of Ann Arbor and some personal property, and a last will and testament disposing of the same.     Defendant Jennie L. Bird is a daughter of Jane C. as was Corrinna M. Bird now deceased, and sisters of plaintiff.     Defendant Earl Martin is executor of the estate of the deceased sister, Corrinna M., who died April 9, 1920.     The will of Jane C. Bird was admitted to probate in the probate court of Washtenaw county on March 28, 1908.     Under it, so far as material here, the personal property of deceased's estate went to her two daughters Corrinna M. and Jennie L. Bird.     Her real estate, which consisted of her 80-acre home farm, was devised to her three living children, John M., Corrinna M., and Jennie L. Bird, and to two children of a deceased son, Judson S. Bird, they to take "by right of representation."     Plaintiff brought this suit to recover from defendants his one-fourth interest in the farm to which his sister had acquired the legal

[2]Fraudulent Conveyances, 27 C. J. § 110.

title and, as he claims, held his interest in trust for his benefit.

The so-called "Bird farm" of 80 acres was long the family homestead. Plaintiff was born there in 1864 and lived upon it, as he testified, for about 30 years. He was married in 1888 and at once took his wife there. The household for some years thereafter consisted of his mother and two sisters, and himself and wife occupying a portion of the dwelling with their increasing family. He remained there and ran the farm about ten years. He then had five children and moved with his family to Ann Arbor, but left his oldest daughter with his mother at the latter's solicitation. He remained in Ann Arbor until about 1907 when he moved with his family to Arkansas. He then had nine children. He and his wife consented to his oldest daughter continuing with her grandmother and aunts as they earnestly solicited them to do with assurance of especial affection for her and that with them she would be tenderly cared for and advantageously reared.

The relations between John and his family and his mother and sisters were apparently affectionate and confidential until about the time of the death of his sister Corrinna M. He had been told of his mother's will and its provisions before he moved from Ann Arbor to Arkansas. He was unable to attend his mother's funeral and lived in Arkansas with his family on a farm in far from affluent circumstances until not long before this suit was begun. During that time he visited Ann Arbor but once, in the summer of 1908, when he and his wife were called back to attend "the flood case against the city," in what capacity or what it was about does not appear.

During the years of his absence a regular correspondence with expressions of good will and affection was maintained between plaintiff and his family and

his sisters, mostly with Corrinna, who had been appointed executrix of their mother's will which was dated November 12, 1890. A codicil of the will added July 12, 1904, provided that the two daughters should have possession, control and use of the home farm, if they so desired, for three years after testatrix's death and it should not be sold or distributed during that time and gave to each of them $300 more than originally provided. The testimony shows the daughters were desirous of continuing their home there together, and in fact did so until Corrinna died in 1920.

On February 27, 1908, while their mother's will was being probated, Corrinna wrote plaintiff a lengthy letter, full of expressions of good will and affection, devoted mostly to unimportant local matters, with personal references and details of incidents on and around the old home, commencing:

"My Dear Brother John: We have begun to be afraid something was the matter as we had not received a letter from any of you in two weeks, but Tudie got a nice one from Jessie and her mother today. You all write such interesting letters that we feel as if we had been cheated if we do not get one every week."

Bearing upon the issue involved here she mentioned that one Sauer was making a claim as a creditor against plaintiff and charging he had absconded to defraud his creditors when he went to Arkansas, which she pronounced as "too absurd, when you had a public auction and every one knew you were going," and stated she and her sister went to see Judge Harriman about it, who just laughed and said it was a bluff, for them not to walk the floor about it, but suggested that John give them a quitclaim deed, saying further:

"Mr. Harriman is going to make out a deed and send it to you to sign. He will write you and explain.

You know, John, this will not make any difference in what you will have some time.   I shall never feel that it is all ours but only that you have out of the kindness of your heart let us have it to live on.   But whenever the place is divided up you shall have your share.   I hope you understand just how we feel about it.   If I should put in a bill for Tudie's care it would only be to help us hold the place, for I never did a thing for her that I did not want to do and love to do and the same in regard to caring for our mother.   But I guess you will understand."

This letter is signed "Your loving sister, Cora."

They received the quitclaim deed, but without any explanation from Judge Harriman, and he and his wife executed it as she requested, relying on the assurances Cora had written them.   When plaintiff and his wife returned to Ann Arbor to attend the flood case nothing occurred to arouse their suspicions or weaken their confidence in the sisters.   They visited congenially together and talked of their mother's will, and Corrinna's appointment as executrix, which was agreeable to all.   In talking of it to them she said to John:   "Now you can all trust me, I will do the same to you and John as by ourselves.   I will do what is fair by you and you can trust me."   She referred to the additional $300 each left to the two sisters in the codicil, and John's wife related the substance of what passed between them in part as follows:

"We talked with Jennie and Cora Bird in reference to the transaction about the deed and in reference to the administration of the estate at that time.   *   *   * Cora said (of the $300 codicil provision) : 'Now, this is to pay us for taking care of our mother, and for the doctor and for the expenses and for all those expenses.'   She was talking about that will leaving them the use of the place for four years.   Cora said: 'This did pay us for taking care of our mother and pay the doctor's bills and expenses.'   We told her we were perfectly satisfied and Jennie said: 'Yes, we all understand that.'   There was nothing said about there being

more claims.    They said that they would pay all claims against the estate and would pay them for taking care of their mother.    They said deferring the settlement for some years would give them a chance to bring the estate up to a place where it would bring more.    Cora said: 'If we have to sell now, we will not get anything near what the place is worth, but we will do all in our power to bring the place up to a state where it will bring more money.'    In the meantime they were to live on the estate, and the estate was to be kept open and any time we wanted the place sold and divided up after three years it should be done.    *    *    *    But we all thought it advisable to hold the place until it would bring a better price when it was sold."

Plaintiff testified in substance to like effect, said Cora stated, and it was understood, that the estate could not be closed anyway until the three years during which his sisters were given the place expired; that he believed what they told him and had implicit confidence in their assurances.    They wanted to live in the old home and he was willing they should; what his sisters wanted and proposed was agreeable to him, and relying on it he made no other investigation and returned with his wife to his Arkansas home; their friendly correspondence continued as before and he left matters of the estate entirely in their hands.    His wife testified of Cora referring to the farm in a letter which they received some years later, but could not find, in which she said in substance that if any time they became dissatisfied and wanted their share of the place she would "see that it is sold and divided up and you shall have your share, but if you will let me keep my home here as long as I live I will see that you get your share and are well paid for your time in waiting."

Whether she so wrote that or not, that was what they did, and she kept her home there until she died. In the meantime, however, while John and his family

were in Arkansas, and unknown to them, she petitioned for and obtained an order from the probate court authorizing her to sell the farm to pay debts of the estate and expenses of administration; and sold the same to his sister Jennie L. Bird for $5,710.     She then rendered her final account, showing proceeds of real estate $5,690.18, crediting herself as executrix with disbursements for debts and expenses of administration amounting to $5.690.18, of which $3,170 were for her services and $1,200 for the services of her sister Jennie, with no explanation of what those services consisted.     Her final account was allowed and probation of the estate closed in February, 1909. Jennie then deeded a half interest in the farm to her sister Corrinna.     Jennie testified of the sale, on cross-examination:

"I did not pay any money at all at that time.     I did not know I did not have the right to do what I had a mind to do after I bought it.     I guess it was right that my sister, Cora, and I entered into a deal which anticipated that I would buy this property at this sale and would then turn back to her a half interest in it. Our interests were as one, my sister and I, and I don't see that it was wrong for us to do that.   *   *   *   I think my claim was $1,200 and my sister's claim was more.   She was nursing the people.   I did not have any time to do anything at home.   I had to be away earning money and worked down town."

Two somewhat illuminating side-lights to this proceeding appear in the testimony of William Whiteman, an old friend of the family, and Mrs. Westfall, a daughter of Judson S. Bird, deceased, who under her grandmother's will was devised an eighth interest in the place, "by right of representation."   Whiteman was appointed by the probate court one of the commissioners on claims against the estate of Jane C. Bird and testified that when they came to discuss the matter it was proposed to bring in bills enough to

cover the entire estate, including a bill by the daughters for caring for John's oldest daughter who married defendant Martin; that it looked to him as though they proposed to take John's entire interest in the place from him which he did not think right, and as they were both friends and neighbors of his he asked the probate judge to appoint some one in his place and withdrew. He testified that at the time of the trial the fair market value of the 80 acres was about $400 per acre.

Mrs. Westfall, whose home was in Battle Creek, testified that some time after the death of her grandmother she was persuaded by her aunts Jennie and Cora to give them a quitclaim deed of her interest in the estate, and she signed what she supposed was the one sent to her brother. Her aunt Cora promised to read the will to her but never did. She afterwards talked to her aunt Jennie about it and testifies of the interview:

"I told her that I felt some hesitancy about signing away my interest for fear that I might regret it in the future. Her reply was, it is my ambition to build up the farm so that the estate can be left to the heirs just as your grandfather had wished it to be. That is why I am going into business with Earl. Then she said that they had some plans for presenting bills to the estate of my grandmother, Jane C. Bird so as to get the farm into Cora Bird's name, so that any business venture of Jennie Bird's would not endanger the title to the farm. She said something about a bill for the care of my cousin Julia C. Bird, now Julia Martin, who lived with them. I did not understand about this matter but thought my agreement to sign off took away my right to ask questions and I said, 'It looks to me like a big undertaking but I suppose you understand about it.'"

No word of these proceedings reached plaintiff out on his Arkansas farm. After Cora's death John's wife went back to Ann Arbor to see her daughter, as

she stated, and then learned that Cora had left a will ignoring her brother. She then went to see Jennie, who told her their bills, the doctors and other debts took the farm. Of the deed they asked John and his wife to sign she said, "that wasn't used, that was stricken out, we didn't need it."

After listening to the detailed testimony as introduced from which the foregoing is but a meager outline of some salient parts the trial court was of opinion that the facts and circumstances shown convincingly sustained plaintiff's claim of fraud and violation of the trust which his sisters had assumed, and held that:

"plaintiff is entitled to the ownership in fee simple of an undivided one-fourth interest in the lands of Jane C. Bird, deceased, subject to the payment of his *pro rata* share of the legacies totaling the sum of $600 to his sisters, as provided in the codicil to the will of Jane C. Bird, deceased, and subject to his *pro rata* share of disbursements shown by the final account of the executrix of the estate of Jane C. Bird, deceased, less claims allowed in favor of Corrinna M. Bird and Jennie L. Bird against said estate. It being the opinion of the court that the claim allowed to Corrinna M. Bird and Jennie L. Bird against the estate of their mother shall be deemed void and held for naught as against the rights and interests of the plaintiff, John M. Bird."

The court thereafter entered a decree to work out that result with provisions to protect certain interests of innocent parties who intervened.

Three propositions are urged by the defense as ground of reversal; that plaintiff was guilty of laches, has not shown the claims of his sisters against their mother's estate were fraudulent, and having deeded his interest in the premises to his sisters to defeat the claims of his creditors he is estopped from his claimed right to restoration. The length of time which intervened before plaintiff acted might naturally sug-

gest the question of laches, but his testimony is positive and persuasive that he acted with reasonable promptness after learning of the betrayal of trust, and is well supported by the attending circumstances; as also his contention that the claims of his sisters against their mother's estate were false and fraudulent, especially in view of what they said to and wrote him and his wife on that subject. The circumstance of his giving his sisters a deed of his interest in the farm at their request on the suggestion of Judge Harriman, if he did so suggest, gives color to the claim of an attempt to sequester his property to defeat his creditors; but no creditor is complaining. However intended, it was not used for that purpose. His sisters devised another, if not a better way, to which he was not a party. As between him and his sisters it is fairly shown that he deeded them his interest in that property at their request in trust, to possess, use and hold intact in anticipation of enhanced values for their mutual benefit. The trust was declared both orally and in writing.

The decree will stand affirmed, with costs to plaintiff.

McDONALD, C. J., and CLARK, BIRD, SHARPE, MOORE, FELLOWS, and WIEST, JJ., concurred.